UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

MICHAEL L. MURRAY                    CIVIL ACTION NO. 06-cv-0308

VERSUS                               JUDGE HICKS

WARDEN LOUISIANA STATE               MAGISTRATE JUDGE HORNSBY
PENITENTIARY

## REPORT AND RECOMMENDATION

### Introduction

A Caddo Parish jury convicted Michael Murray ("Petitioner") of the second degree murder of Ron Green. The court imposed a mandatory life sentence. The conviction was affirmed on direct appeal. State v. Murray, 827 So.2d 488 (La. App. 2d Cir. 2002) writ denied, 852 So.2d 1020 (La. 2003). Petitioner then filed a post-conviction application, which the state courts denied. He now seeks federal habeas relief on several grounds. It is recommended, for the reasons set forth below, that the petition be denied.

### Relevant Facts

Petitioner admits that he shot and killed Green and attempted to hide his body, but he argues that the shooting was in self-defense. Many of the basic facts are not contested. Those facts, and a summary of Petitioner's testimony, will be set forth below to provide background for the issues that follow. This recitation of the facts borrows heavily from the more extensive statement of the facts found in the state appellate court's decision.

Petitioner joined a singles group at the First United Methodist Church in Shreveport. Ron Green, the victim of the murder at issue, was also a member. Mr. Green was a self-employed disc jockey and assembled sound equipment at his home in Bossier City. Petitioner did computer work at his home. The two men were friends who frequently collaborated with each other on sound and computer projects. They often e-mailed each other. Petitioner had been to the victim's house several times. Both men were on the board of the singles group and saw each other at least weekly for about two years.

Mr. Green was popular and dated several women in the singles group, including some who were also on the board. Green had a girlfriend in the group, Katie Mayeaux, but each of them also dated others. For a time, Petitioner and Green both socialized with Ms. Mayeaux, but Petitioner did not know that Mayeaux also dated Green. Petitioner was surprised when he learned about this.

For a time, Petitioner had his own girlfriend in the group, Mary Tellez, who did not date Green. Ms. Tellez stated that Petitioner often warned her that Green would try to use her. According to Ms. Tellez, Petitioner said that he was upset over the way Green was running the singles group, and he was aggravated that Green was having sex with women on the board. Ms. Tellez could not remember if she told Petitioner about instances in which she had lunch with the victim to discuss the business of the singles group. After about six months, Ms. Tellez ended her relationship with Petitioner, but they remained friends.

Petitioner told several of his friends of his displeasure with Green, indicating that he felt Green was using his romantic associations with the female board members to gain control of the board and the singles group.

Petitioner's family owned houses on Wagner Street and on Laguna Street in Shreveport. At the time of the homicide, Petitioner lived with his children on Laguna Street and used the Wagner Street house for storage. He and his wife were divorced, and he had custody of his 11-year-old daughter and 9-year-old son. In late summer 2000, Petitioner's children were visiting their mother in Arkansas.

On July 29, 2000, Petitioner accompanied Ms. Tellez to a local water park. A former member of the singles group saw them there and asked if they were back together. Petitioner said they were not. The friend asked how things were going in the singles group. Petitioner responded, "Not so well, but that may change soon." That night due to bad weather, Ms. Tellez stayed at Petitioner's house. She testified that "one thing led to another." The couple conceived a child that evening.

The next day, July 30, 2000, Petitioner saw a friend, John Novak, at church and they talked for 10 to 15 minutes. Petitioner expressed displeasure over a lecture Green had given to the singles group. He also said that he thought Green controlled the group and that Green was "doing" three of the women in the group. Petitioner generally demonstrated frustration regarding Green's work with the group.

About a week later, on the afternoon of Monday, August 7, 2000, Petitioner shot and killed Green.  Petitioner gave the following account.  Petitioner called Green several times that day to get him to come to the house on Wagner Street.  Petitioner claimed that he needed to drop his uncle's car off at the airport, and that he wanted Green, whom he had never asked for a ride before, to follow him there and drive him home. He also claimed that he wanted Green to give him some advice about repairing a china cabinet stored at the Wagner Street house.  He stated that he wanted to ask Green about the substitution of a component in a circuit Green had designed.  He further claimed that, because Green was knowledgeable about guns, he wanted Green to advise him as to the price he might be able to get for his .38 caliber revolver.  According to Petitioner, they had discussed the gun before at the singles group, but they did not discuss the gun on the phone that day because Green did not like to talk about guns on the phone.

Petitioner called Green's house at 11:33 a.m., 12:10 p.m., and 12:29 p.m., but he got no answer.  Green returned Petitioner's call at 12:30 p.m.  Green had some other calls to return, and Petitioner said that he would call Green back shortly.  At 12:59 p.m., Petitioner again called Green and asked him to come to the Wagner Street house.  He then got the gun out, which was loaded, and waited for Green to arrive.

According to Petitioner, Green arrived at the Wagner Street house around 1:20 p.m. Petitioner said that he met Green outside, the men shook hands, and they went inside. Petitioner contended that Green did not seem to be as charismatic as usual. Green gave an

opinion about the furniture that was not to Petitioner's liking. As Petitioner examined the furniture himself, Green walked over and picked up the gun. Petitioner claimed that he warned Green that the gun was loaded. Green made a comment about people not doing what they tell you and mentioned that he had asked Ms. Mayeaux to marry him.

Petitioner says that he then went to the kitchen for some bottles of water for the trip to the airport. When he returned to the living room, he asked Green if he had unloaded the gun. Green did not answer, but asked, "Why do people lie to you?" as he waved the gun around, talking with his hands. Petitioner asked Green to point the gun the other way. Green turned back to Petitioner, pointed the gun at him and asked, "How does it feel?" Petitioner said that Green had almost a grin or a smile on his face as he moved toward Petitioner, and it was almost as if he were looking through Petitioner.

Petitioner claimed that he reached to take the gun, but Green resisted. Petitioner said that he told Green to give him the gun, but Green did not respond. Petitioner stated that they fell to the living room floor in a struggle for the gun, with all four of their hands on the gun. Petitioner contended that Green kicked him in the face and chest and that he bit Green's calf. Green was five feet nine inches tall, weighed between 140 and 150 pounds, and was in good physical shape. Petitioner was five feet eleven inches tall, weighed approximately 202 pounds, and was not as physically fit as Green.

Petitioner began to tire. He claimed that he jerked the gun and it discharged, striking Green in the right leg. Green relaxed and Petitioner took control of the gun. Both men stood

up. Green said, "You shot me," and started toward Petitioner. Petitioner claimed that he then shot Green twice in the chest. Petitioner stated that he then passed out, and Green was dead when Petitioner awoke.

Instead of calling for help, Petitioner contended that he panicked and was afraid that he would lose his children. He stated that he thought his story of what happened would sound illogical. Petitioner stated, "I thought well, maybe I can make it disappear and I considered covering it up at that point...." He said that he wanted to keep his children and that he would walk into a burning building to save his children. He stated that, "Covering this up seemed like a relatively small thing compared to that."

Petitioner moved the body to the bathtub in the house, and he used a kitchen knife to cut Green's throat, severing the jugular and the windpipe. Petitioner claimed he did this to get rid of the blood because the sight of blood made him ill. He turned on the air conditioner and wet the body down to keep it cool. He removed some boxes that Green had bled on and tried to get blood stains out of the carpet. He took Green's pager, car keys, and some other items and hid them at his house on Laguna Street.

Petitioner had a long-time friend, Walter Weferling, for whom he frequently installed computer and telephone networks. Weferling called Petitioner on the afternoon of the killing and asked whether Petitioner would be available to do some work. Petitioner asked Weferling to help him move a car later in the day. At around midnight, Petitioner called Weferling to help with the car. Petitioner drove Green's car back to his home in Bossier City.

Weferling followed and gave Petitioner a ride back to the Wagner Street house. Weferling said that Petitioner was holding a rag when he got out of Green's car. On the way home, Petitioner told Weferling that he had shot and killed someone, he asked about rigor mortis, and he talked about trying to use a trash can to store the body. Weferling called the police the next morning and visited the station to report what Petitioner had told him.

Petitioner bought a trash can to try to move the body, but due to its size and rigor mortis, the body would not fit in the can. Petitioner continued to wet the body down in the bathtub. He also went to Green's residence and removed Green's caller ID device, to retard discovery that Petitioner had called Green's number several times on Monday. He took some dog food with him to feed Green's dog.

On Tuesday evening, the singles group had its weekly meeting. It was unusual for Green to miss a meeting. The members, including Ms. Tellez, were worried. Tellez decided to go to Green's house. Petitioner accompanied her. She noted that Green's car was there, and nothing seemed out of place. Green's girlfriend, Ms. Mayeaux, was out of town, and it was thought that Green might have gone with her. Ms. Tellez called the police when she got back to the church. She went back to Green's house later that night.

On Wednesday, Petitioner returned to the Wagner Street house and wet down the body. The next day, August 10, 2000, Petitioner worked on a job with Weferling but did not discuss the killing. He decided to make another effort to move the body. He wheeled a larger trash can into the bathroom. He cut Green's clothes off and put the body in the trash

can. Petitioner wheeled it to a tin building behind the house and filled it with water. He added septic bacteria and sugar in an effort to cover the odor and speed decomposition. He burned Green's clothes and some other personal effects, as well as the boxes that Green bled on.

On Friday, August 11, 2000, Petitioner noted that the odor was still present and decomposition was not progressing as fast as he thought it would. He called Weferling and asked to borrow a pickup truck to take care of his "dilemma." Weferling's girlfriend had a pickup truck that they agreed to lend to Petitioner.

According to Petitioner, he loaded the trash can (with the body inside) in the bed of the truck and drove to family property in Blanchard. He stored the can and its contents in a barn. Some of the water and "sludge" got on the truck. He washed the truck before returning it to Weferling.

That Friday, Weferling saw a report on television about the disappearance of Green. He had met Green and knew that Petitioner knew Green. He put the information together and concluded that Green might be the person that Petitioner had shot and killed. Weferling called the police again. The police examined the truck and were immediately aware of the strong odor of human decomposition. A cadaver dog alerted on the truck.

That evening, law enforcement officials contacted Petitioner, who agreed to go to the station. Petitioner was given his <u>Miranda</u> rights and agreed to talk with police about some portions of the incident. However, he stated that there were portions of the incident that he

wanted to talk with a lawyer about first. Petitioner was supposed to pick up his children in Arkansas the next day, a Saturday, and was concerned about being released in time to fulfill that obligation. Petitioner claimed that he killed Green in self-defense. He also claimed that nothing like this had ever happened to him before.

Petitioner typed a statement and then took the officers to the body and the gun. Petitioner also took the officers to the Wagner Street house. They saw blood stains in the carpet and recovered bullet fragments. Petitioner showed the officers where he had poured the water from the trash can. Hair and skin were recovered from that area.

Petitioner took the officers to the house on Laguna Street where he had hidden the gun and burned Green's personal items. He pointed out some injuries on his face, chest, and leg that he claimed were sustained in the struggle with Green. These were photographed by the police. Petitioner was released and picked up his children in Arkansas on Saturday. On Sunday, Petitioner was arrested and charged with the second degree murder of Mr. Green.

**Sufficiency of the Evidence**

Petitioner was convicted of second degree murder, which La.R.S. 14:30.1 defines, in relevant part, as the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. Petitioner argues that the State failed to prove that he had the required specific intent and did not prove that the shooting was not committed in self-defense. This issue was addressed on direct appeal in the state courts.

In evaluating the sufficiency of evidence to support a conviction "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 99 S.Ct. 2781, 2789 (1979). The trier of fact has broad discretion to "resolve conflicts in testimony, to weigh evidence, and to draw reasonable inferences from basic facts to ultimate facts." Id. The Jackson inquiry "does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit." Herrera v. Collins, 113 S.Ct. 853, 861 (1993).

The Louisiana appellate court invoked, recited and applied the Jackson standard on Petitioner's direct appeal, so its decision was not "contrary to clearly established Federal law," and Petitioner can obtain habeas relief only if the state court's decision was an "unreasonable application" of Jackson. 28 U.S.C. § 2254(d); Williams v. Taylor, 120 S.Ct. 1495, 1523 (2000); Santellan v. Cockrell, 271 F.3d 190, 193 (5th Cir. 2001).

Under the unreasonable application clause, a federal court is permitted to grant the writ if the state court has identified the correct governing legal principle from the Supreme Court's decisions but unreasonably applied that principle to the facts of the prisoner's case. Williams, 120 S.Ct. at 1523. Even if the federal court, in its independent judgment, has a firm conviction that the state court was incorrect in its application of a federal constitutional principle, that alone does not permit the federal court to grant habeas relief. Relief is not

permitted unless the state court decision was so wrong as to be objectively unreasonable.

Lockyer v. Andrade, 123 S.Ct. 1166, 1175 (2003). And it is only the state court's ultimate decision, not the quality of its analysis or opinion, that is at issue. Neal v. Puckett, 286 F.3d 230, 246 (5th Cir. 2002)(en banc).

The state court noted that Dr. Karen Ross, who performed an autopsy, testified that Green most likely sustained the first gunshot wound to the chest while sitting down and the second wound was inflicted while the victim was lying down. Dr. Cogswell testified that the wounds were not consistent with Petitioner's testimony that the victim was coming toward him when Petitioner fired the gun.[1] Dr. Ross and Dr. Cogswell pointed out that there were no wounds to the victim's legs, which was contrary to Petitioner's testimony that the gun went off during the struggle and shot the victim in the leg. Dr. Ross also did not find any defensive wounds on Green's body that would have been consistent with the type of struggle described by Petitioner.

A Shreveport police detective testified that he looked at the injuries that Petitioner claimed to have received in the fight. The detective noted that the injury to the face appeared to be an old wound. Photographs depicted relatively minor injuries.

---

[1]The transcript notes that the video deposition of Dr. Karen Ross was played for the jury. Tr. 1639. The court reporter did not transcribe the testimony, but the video was admitted as an exhibit in the state court trial, and it has been filed in this federal record at Doc. 17.

Ms. Mayeaux testified that Petitioner had not asked her to marry him. Other witnesses testified that Green had an outgoing and friendly personality, and that he took gun safety very seriously, both of which traits were contrary to Petitioner's description of Green's actions on the day of the shooting.

Petitioner told police that he responded by attempting to hide the body because, in part, he had never been in a situation like that before. Evidence was presented that Petitioner had, in 1978, shot a drunken co-worker who came to his home and threatened him with a tire iron. The man was angry because he believed Petitioner had lunch with a woman whom the assailant had an interest in. Petitioner called the police and his attorney after the shooting. The assailant survived and corroborated Petitioner's version of the shooting, so no charges were filed against Petitioner.

Petitioner's credibility was impeached with evidence of a prior felony conviction which stemmed from a theft of approximately $140,000 in money orders. Petitioner served about five years in prison. The state court also noted that there was plenty of evidence of motive, particularly concerning Petitioner's statements of disapproval of Green and the way he ran the singles group. The state court concluded that, based on this record, the jury could reasonably find that Petitioner was guilty of second degree murder. State v. Murray, 827 So.2d at 495-99.

Petitioner argues that there is insufficient evidence of specific intent to kill or inflict great bodily harm, given the State's necessary reliance upon circumstantial evidence.

Louisiana law regarding circumstantial evidence requires the prosecution to exclude every reasonable hypothesis of innocence to convict. La. R.S. 15:438. But on habeas review, only the <u>Jackson</u> constitutional standard need be satisfied. <u>Foy v. Donnelly</u>, 959 F.2d 1307, 1314 n.9 (5th Cir. 1992). The State's case was based on a great deal of circumstantial evidence, but that evidence was quite strong, and there was also the testimony of the experts regarding the position of the victim when he was shot. That position did not indicate a victim who was engaged in an attack. There were ample reasons for the jury to discount Petitioner's credibility, and credibility choices are generally beyond the scope of habeas review. <u>Schlup v. Delo</u>, 115 S.Ct. 851, 868 (1995). Considering the evidence discussed above, this federal court cannot say that the state court's adjudication regarding the sufficiency of the evidence was an objectively unreasonable application of <u>Jackson</u>. Rather, it appears to be a sound and well-reasoned application of the law.

Petitioner argues on this issue, as he does in connection with others, that the court should discount testimony by Dr. Ross that the victim may have been alive when Petitioner cut his throat to drain his blood. Petitioner points to the testimony of a defense forensic expert, Dr. Vincent Dimaio, who testified that it was medically impossible to determine whether Green was still alive at that moment. Petitioner attempts to inflate the question of whether the victim was dead or alive when Petitioner cut his throat into the decisive issue in the case, but it is not. The state appellate court said that the expert testimony that the victim was still alive at that point would "also indicate" specific intent to kill or inflict great bodily

harm. It added that, "even if the victim was dead when the defendant slit his throat ... this action [and Petitioner's other efforts to conceal the crime] were indicative of the defendant's consciousness of guilt." Murray, 827 So.2d at 499. Thus, this issue may be relevant, but it is far from decisive. Petitioner could have been soundly convicted without any testimony on that issue because there was evidence that he shot Green twice based on jealousy and other improper motivation rather than the claimed self-defense. Furthermore, it was the province of the jury to assess the weight and credibility of the competing expert testimony.

**Statements to Police**

Petitioner filed a pre-trial motion to suppress his statements to the police. The motion urged that the statements were given in exchange for promises that he would not be arrested, so that the statements were not freely and voluntarily given. Tr. 540-41. During the hearing on the motion, an issue was presented as to whether Petitioner invoked his right to counsel before he gave his statements.

Detective Rodney Johnson testified at a hearing on the motion to suppress. He was the lead investigator on the case. Johnson, together with Detective Jeter and two Caddo Parish deputies, went to Petitioner's home at 11:30 p.m. one night. Johnson asked Petitioner if he would mind coming to the police station and giving a statement, and Petitioner agreed to come. Johnson had not told Petitioner why he wanted to talk to him, but Petitioner said during the ride to the station that he wondered when the police would get around to talking

to him because he felt like he was a suspect. Petitioner was the first person to mention the victim's name. Tr. 657-61.

At the station, Detectives Johnson and Jeter took Petitioner in an office and presented him a standard <u>Miranda</u> form. Petitioner signed the waiver and stated that he understood his rights. Johnson testified that he asked Petitioner if he recently borrowed a red truck from anyone. Petitioner replied that he borrowed the truck from Mr. Weferling's girlfriend "and then he stopped and he sat quietly and he finally went, 'Okay, I think I want to talk to my attorney about part of this.'" Johnson said that he asked Petitioner if he was requesting an attorney, and Petitioner answered "Well, about part of this." Petitioner then added, "Well, I will tell you the rest of it. I just want my attorney for part of it." Johnson said he stopped the interview, asked for the name of the attorney (Tommy Cryer), and attempts were made to call the attorney. There was no answer at the office (it was after hours), but the officers were able to find a home address for the attorney. Johnson testified that Detective Jeter told Petitioner that he would go get the lawyer for him and bring him to the station, but Petitioner did not take the offer and repeated that he wanted to talk about the case except for a part of it. Tr. 662-66.

Detective Johnson testified that Petitioner and Detective Jeter were getting aggravated with each other, so Johnson asked Jeter to leave the room. Johnson asked Petitioner what he wanted to do, and Petitioner said he wanted to talk to Johnson "about part of it," and he said he wanted to discuss a hypothetical situation. Petitioner expressed concern that others would

not believe his story, and he feared for the loss of his children.  The officers stepped out of the room at one point and allowed Petitioner to use the phone to call a friend in private. Petitioner made three or four such calls, totaling about two hours.  Petitioner then presented Johnson with some hypothetical shooting situations and asked if the facts presented a justified shooting.

Johnson called an assistant district attorney and sought advice about Petitioner's limited request to consult counsel, and on other issues, and the prosecutor told Johnson that questioning could proceed.  The prosecutor also told Johnson not to promise anything; he suggested that Johnson "Mirandize" Petitioner again, so Johnson once again reviewed the Miranda rights with Petitioner.  When Johnson asked Petitioner if he was waiving his rights, Petitioner said no, but he wanted to continue talking.  Johnson asked Petitioner what he wanted to do, and Petitioner responded by asking Johnson what he wanted.  Johnson told Petitioner that he wanted the body, the gun, the location of the shooting, and some type of statement. Tr. 667-73. Petitioner kept asking if he was going to be arrested, regarding which Johnson testified, "I was not going to promise him that I would never arrest him but that I would investigate this story, this whole incident." Johnson admitted that he did tell Petitioner that he "probably" would not arrest him that night.

Petitioner said he did not want to answer a lot of questions, and he asked for clarification as to whether he had to answer if he did not want to. Johnson told Petitioner that he could answer what he wanted.  Petitioner eventually asked, "Okay, how do we do this

statement?" Petitioner declined to be recorded, but he asked for paper and a pencil to write out his statement. He then noticed a computer and asked if he could use it to type the statement. The officers left the room and let Petitioner type the statement, which took almost 90 minutes. About five hours after Petitioner arrived at the police station, he signed that written statement. Tr. 674-78.

Petitioner asked what was next, and Johnson said "the body." Petitioner said, "Let's go," and he led the officers to the body hidden in the barn. Petitioner signed a consent to search the property. Tr. 679-82. Petitioner then directed the officers to the Wagner Street address and said, "This is where it all happened." Petitioner signed a consent to search form and let the officers inside. Tr. 683.

Petitioner showed the officers around the scene, described some of his actions, and, while looking at a piece of furniture, said, "It all happened here." Detective Johnson asked what, and Petitioner responded that he wanted to wait and talk to his attorney about that part. Johnson said that he skipped that part and asked, "What else?" Petitioner went on to describe how he tried to hide the body. Petitioner then accompanied the officers to his home on Laguna, where Johnson said Petitioner was in a hurry to get finished because he was worried about going to pick up his children. Petitioner directed Johnson to a box that contained a revolver and some ammunition. Petitioner told police that the gun belonged to the victim. (It was stipulated at trial that the gun belonged to Petitioner. Tr. 1465.) He also directed Johnson to the place where he had burned the victim's clothes. Petitioner talked about the

injuries that he claimed to have suffered in the altercation, and an officer took photos of his body. The police left Petitioner at his home at about 8:00 a.m. Tr. 683-86.

Shreveport Detective Jeter and a Caddo Parish sheriff's deputy both testified at the hearing that the deputy asked Petitioner, who lived outside the Shreveport city limits, if he was sure that he wanted to go to the station with the city officers, and Petitioner said that he was sure. Tr. 703-04, 711. Jeter testified that Petitioner told Detective Johnson that he did not want a lawyer present, but when the questioning turned to the use of the truck, Petitioner sat up and said, "I want to talk to my lawyer about this part." Jeter agreed with Johnson's recollection of the attempts to call the attorney and locating his home address. Jeter said the officers talked about Jeter going to the attorney's home to pick him up but, during the conversation, Petitioner opted to call another person for advice. Tr. 712-13.

The discussion continued. Jeter testified that Detective Johnson told Petitioner that he would not be arrested that night, but Jeter said neither he nor Johnson promised Petitioner that he would never be arrested or charged. Tr. 718-19. Jeter said that at one point when Petitioner was typing his statement he stopped and was just staring at the computer screen, where a paragraph or two of his statement had been typed. Jeter asked if Petitioner was Okay, and he responded, "Yeah, I don't know what to say. I want to talk to my lawyer at this point." Jeter also described the statement as, "Well, I really want to talk to my lawyer about this part." Jeter suggested that he include that in his statement. Tr. 721.

Corporal Eatman was present during some of the questioning. He said that Petitioner made references that he "may want to speak to his lawyer about part of a situation." Eatman added that Petitioner was "being selective" in his hypothetical situations. Tr. 735.

David Alford, the man who Petitioner called from the police station during the interview, testified at the hearing. Alford had worked as a law enforcement officer for 17 years, the last six of which were with the Bossier Police Department. Alford and Petitioner were friends. When Petitioner called Alford, he presented him with a hypothetical self-defense scenario and asked if he thought the police would let the shooter go if he gave a statement to that effect. Alford testified that he told Petitioner he "needed a lawyer, and the truth was the best thing in all situations, but he needed a lawyer." Petitioner commented during one of the two or three phone calls that he did not have his lawyer's home phone number, and Alford offered to try to "hunt him up." He did not do so because Petitioner replied that he would talk to the lawyer "in the morning" after he got out. Alford said that Petitioner told him that he would be allowed to go home that night if he gave a statement, but he never said the police would not charge him or arrest him later. Tr. 741-58.

Petitioner testified at the hearing that the officers advised him of his Miranda rights at the station and began to question him. Petitioner testified that an officer asked a question about the truck, to which Petitioner replied, "At this point I would like to talk to [a] lawyer." The police offered him the phone and a phonebook, but the book had only a business number, and it was 1:00 a.m. Petitioner testified that the officers did not offer to go to the

attorney's home, and the officers acted as if there was no way to find the address. Petitioner said that he did have the attorney's unlisted home number at his house, and he did call the attorney at home the next day to discuss the case. Tr. 758-62.

Petitioner testified that he asked if he could present a hypothetical scenario without it being taken as a statement to be used against him. Even though Petitioner began to speak of a hypothetical situation, when a detective asked him about ownership of the gun, Petitioner said he replied that the gun was "something I didn't want to go into at that point without the lawyer." Tr. 763. Petitioner testified that "there was no promise that they would not arrest me" and that "they never promised they wouldn't arrest me or anything" but Petitioner said he felt as if he was in the eleventh hour because he needed to pick up his children in Arkansas in a few hours. Tr. 764. The officers had told Petitioner that he would be released that day if he gave them the body, the gun, and a statement. Petitioner was not sure he believed the officers, so he sought an opinion from Mr. Alford. Petitioner decided to type his statement, which he said he would not have done but for the agreement to release him that night. Tr. 765.

Petitioner admitted on cross examination that he was familiar with his <u>Miranda</u> rights from prior incidents. Tr. 774-75. Petitioner conceded that he signed the <u>Miranda</u> waiver and that the officers treated him well, allowed him to make phone calls as needed, and offered drinks. Tr. 780. Petitioner said that he inferred that he would be arrested if he did not give a statement that night, but he admitted the officers never told him that. Tr. 785.

On rebuttal, Detective Johnson testified that the officers were able to determine Attorney Cryer's address that night through the use of water utility records. He denied a claim by Petitioner's that the officers told Petitioner that the computer was not functioning so that they could not find the address. Johnson denied that the officers ever told Petitioner that he would not be released that night unless he gave a statement and revealed the location of the body and gun. Johnson said that if Petitioner had not given the statement, he would have consulted the prosecutor on what to do next. Tr. 797-802.

Officer Jeter testified on rebuttal that the officers were able to find Attorney Cryer's home address and never claimed the computer was not working. When asked if he had offered to go get Mr. Cryer, Jeter said it was "implied" that he would do so, but he admitted that he never made a direct offer to go get attorney Cryer. Tr. 803-05. This conflicted with the officers' earlier testimony that an offer was made.

The trial court judge, after hearing this evidence and argument, summarily found "no promises were made, that the statements were freely and voluntarily made," and that requirements of <u>Miranda</u> were satisfied. Tr. 811-12. The state appellate court reviewed the issue at length and determined that the limited invocation of the right to counsel on certain issues did not preclude the admissibility of the statements that fell outside the limited invocation. <u>Murray</u>, 827 So.2d at 499-502.

Federal constitutional law provides that if a suspect knowingly and intelligently waives his right to counsel after receiving <u>Miranda</u> warnings, law enforcement officers are

free to question him.  But if the suspect requests counsel at any time during the interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation.  Edwards v. Arizona, 101 S.Ct. 1880 (1981).  The invocation of the Miranda right to counsel requires a statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.  If the suspect makes a reference to an attorney that is ambiguous or equivocal, so that a reasonable officer would have understood only that the suspect might be invoking the right to counsel, questioning need not stop.  Davis v. U.S., 114 S.Ct. 2350 (1994).  And it is possible for a suspect to make a limited invocation of the right to counsel that permits questioning to continue on matters outside the invocation.  Connecticut v. Barrett, 107 S.Ct. 828 (1987).

The state appellate court relied upon Barrett in its ruling.  The suspect in Barrett told police that he understood his Miranda rights and would not give a *written* statement unless his attorney was present, but he had "no problem" talking about the incident.  He then gave an oral statement and admitted involvement in a sexual assault.  The Supreme Court, noting that the fundamental purpose of Miranda is to insulate the suspect's exercise of his choice from government compulsion, held that the statement was admissible as it would serve no legal objective to suppress the statement that the suspect so willingly made.

The state appellate court obviously accepted the testimony of the officers that Petitioner invoked his right to counsel only with respect to a certain topic or topics.  Petitioner's own testimony is largely consistent with that view.  State court determinations

of such factual issues are presumed to be correct, subject to rebuttal by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). The legal decision flowing from those facts is based on the limited invocation rationale recognized by the Supreme Court in <u>Barrett</u>. That case addressed an invocation limited to the form (written or oral) of the statement. Neither party has directed the court to any Supreme Court authority regarding whether the limited invocation doctrine does or does not apply to topics or subject matter such as in this case. This court need not decide the finer points of that issue because habeas relief is available only if the state court's adjudication of this issue was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." § 2254(d)(1). <u>See</u> <u>Lockyer v. Andrade</u>, 123 S.Ct. 1166 (2003)(Supreme Court precedents regarding disproportionate sentence claims and three-strikes statutes not clear; habeas relief not warranted) and <u>Yarborough v. Alvarado</u>, 124 S.Ct. 2140 (2004) (habeas relief not proper when state court did not consider <u>Miranda</u> factors such as youth and experience; Supreme Court precedents did not clearly require such consideration). It was within the realm of reasonableness for the state court to apply <u>Barrett</u> in this setting, and Petitioner has not identified any clear Supreme Court precedent to the contrary. Accordingly, habeas relief is not available on this claim.

**Evidence of Prior Shooting**

Petitioner told police that he panicked, even though the shooting was in self defense, because nothing like that had ever happened to him and he did not trust the police. In

response, the State filed a pre-trial notice of intent to use "other crimes" evidence regarding the 1978 incident in which Petitioner shot a man in self defense, reported it to the police, and was cleared. The trial judge conducted a hearing, over a relevance and Rule 404(B) objection, and held that the evidence was admissible. Tr. 635-51. At trial, Richard Mutter and C. A. Lewis, who were policemen involved in the prior incident, testified about how that matter was handled. Tr. 1326-39.

Petitioner argued on direct appeal that the trial court violated L.C.E. art. 404(B) by admitting the evidence and erred by allowing the police officers to read from their old reports when they had no independent recollection of the events. The entire argument was based on Louisiana law, with no reference to a federal constitutional claim. Tr. 2301-04. The same was true when Petitioner presented the issue in his discretionary writ application to the Supreme Court of Louisiana. Tr. 2445-49. The state appellate court found that the evidence was both relevant and admissible under Louisiana evidence law. State v. Murray, 827 So.2d at 502-05.

Petitioner presents the identical arguments in his federal petition, but he now frames them as giving rise to a Fourteenth Amendment due process violation. No such federal claim was presented in the state court appeal. Before seeking federal habeas relief, a state prisoner must first exhaust available state remedies, 28 U.S.C. § 2254(b)(1), to give the state the opportunity to pass upon incorrect alleged violations of federal rights. To provide the state with the necessary opportunity, the prisoner must "fairly present" his federal claim in each

appropriate state court to alert that court to the federal nature of the claim. Baldwin v. Reese, 124 S.Ct. 1347 (2004).

The state argues that Petitioner did not fairly present a federal issue, and the rules found in cases such as Baldwin and Duncan v. Henry, 115 S.Ct. 887 (1995) support that defense. The petitioner in Duncan, the dean of a church day school who was charged with molestation, complained in the state courts that an evidentiary ruling that allowed evidence of a claimed molestation that happened 20 years earlier, was a miscarriage of justice under the state constitution. He then filed a federal petition alleging that the same evidentiary error amounted to a denial of due process under the federal constitution. The Supreme Court held that the prisoner did not properly apprise the state court that his evidentiary claim was not only a violation of state law but also allegedly a federal due process violation.

Petitioner in this case took the same approach, and the same result is required. Any due process claim based on the evidence ruling was not exhausted. It is now too late under La. C. Cr. P. art. 930.8 for Petitioner to present the claims to the state courts. The federal court is to treat such claims as technically exhausted but subject to a procedural bar that cannot be overcome absent a showing of cause and prejudice. Jones v. Jones, 163 F.3d 285, 296 (5th Cir. 1998). Petitioner responded to the exhaustion defense in a traverse. He made no attempt to show cause and prejudice. Rather, he argued only that his pro se pleadings should be construed liberally so as to excuse the failure to exhaust. That argument is inadequate to overcome the failure to exhaust and the related procedural bar.

Assuming a federal claim was exhausted, no relief is warranted on the merits. Federal courts do not grant habeas relief based on mere errors in the application of state evidentiary rules or even consider it relevant whether state evidentiary rules were satisfied. Only federal constitutional errors that satisfy the demanding standards of Section 2254 merit habeas relief. The Due Process Clause provides a mechanism for relief when a state court wrongfully admits evidence, but only if the evidence is so unduly prejudicial that it renders the trial fundamentally unfair. <u>Bigby v. Cockrell</u>, 340 F.3d 259, 271-72 (5th Cir. 2003), citing <u>Dawson v. Delaware</u>, 112 S. Ct. 1093 (1992) and <u>Estelle v. McGuire</u>, 112 S.Ct. 475 (1991). If constitutional error is found, a petitioner's claim will still fail absent a showing that the evidence had a substantial and injurious effect or influence in determining the jury's verdict. <u>Bigby</u>, 340 F.3d at 272. Also, for this court to order relief it must find that the state court performed an objectively unreasonable application of those principles. The state court's decision was a sound and reasonable application of state evidentiary rules. The challenged evidence was not of another crime that would be highly prejudicial. Rather, it was an earlier incident in which Petitioner had been cleared of any criminal wrongdoing, and it was quite relevant to impeach Petitioner's recent claims. Habeas relief is not permitted on this issue.

**Relationship with Children**

Petitioner claimed that his efforts to cover up the shooting were motivated by his concern about the custody and well being of his children. The trial court allowed some

evidence of Petitioner being a good parent, but he did not permit Petitioner to bring a parade of witnesses or elaborate on specific examples of good parenting.

Petitioner argued on direct appeal that the trial court violated L.C.E. art. 404(A) when it did not allow him to introduce additional evidence about his relationship with his children. The brief relied solely upon the evidence article and did not invoke any federal (or state) jurisprudence or make reference to any federal constitutional provision. Tr. 2305-06. The same is true of the discretionary writ application filed with Louisiana's highest court. Tr. 2449-50.

Petitioner now argues in his federal petition that the evidentiary rulings violated his Sixth and Fourteenth Amendment rights, but those federal claims were not raised in the state court proceedings. For the reasons stated with respect to the previous claim, this claim fails for lack of state court exhaustion and the resulting procedural bar. Furthermore, the state appellate court made a reasonable determination that the evidentiary ruling was proper because the evidence did not fall under an exception to the Louisiana rule regarding character evidence of the accused. Murray, 827 So.2d at 505-06. Assuming exhaustion, there is no basis to determine that the state court's decision of this evidentiary issue was so unduly prejudicial as to render the trial fundamentally unfair and require the conviction to be vacated.

**Character Trait of Peacefulness**

Earl Valentine testified that he had known Petitioner about 10 years and that Petitioner was a member of his Sunday School class. Defense counsel asked Mr. Valentine if he had occasion to hear Petitioner's reputation for being a truthful and honest person. Valentine said the issue had not come up. Defense counsel asked Valentine about Petitioner's reputation "for being a peaceful person." The prosecutor objected that the character evidence was not admissible under the Louisiana evidence rules, and the trial judge sustained the objection. Tr. 2032-36.

Petitioner did not pursue this issue on direct appeal, but his post-conviction application presented it as an error of Louisiana evidence law. Tr. 2537--0023. The argument was presented in terms of state law, with the lone reference to federal law being a suggestion that a 1975 amendment to the federal rules of evidence had generally changed how such evidence was viewed.

The trial court judge denied the claim on the grounds that prejudicial evidence errors are not among the grounds for post-conviction relief listed in La. C. Cr. P. art. 930.3. Tr. 2542-B. Petitioner raised the issue in his writ application to the state appellate court, but again presented it in terms of state law. Tr. 2558, 2590-92. The appellate court addressed some of the claims, but made no specific reference to this issue, before finding that the trial court did not err in summarily denying the application. Tr. 2722-23. Petitioner filed a discretionary writ application to the state's high court, and he again presented the issue solely

in terms of state law. Tr. 2724, 2758-60. The Supreme Court denied writs without comment. Tr. 2913.

Once again, Petitioner presented an issue to the state courts in terms of state law and attempted to convert it to a federal constitutional claim only when he arrived in this court. That procedure does not properly exhaust a federal claim for habeas purposes. The claim is technically subject to a procedural bar, and Petitioner has presented no grounds for cause or prejudice. Absent such, the court need not address the merits of this claim.

**Evidence of Post-Killing Actions**

Petitioner's claim No. 5 in his federal petition bears the same heading as claim No. 6, which regards whether an investigator with the prosecutor's office could testify about a prior inconsistent statement by Dr. Ross. The substance of the argument under claim No. 5, however, is entirely unrelated to the title. The substance of the two-page argument is that the state court erred when it ruled that the prosecution could introduce post-killing evidence of Petitioner's actions related to hiding the body. Petitioner argues that this evidence and some photographs were prejudicial and should have been excluded under L.C.E. art. 403. Doc. 1-3, pp. 40-41.

It does not appear that Petitioner presented this issue in his post-conviction application. The issue is presented solely in terms of state evidence law and does not invoke a federal constitutional claim. And the prosecutor stated in closing that he did not publish the autopsy photos to the jury, though the jury could ask to see them. Tr. 2140. The jury did later ask to see the photos, but as arguments on the issue took place, the jury returned a

verdict without seeing the photos. Tr. 2204-06.Accordingly, this argument does not provide grounds for this federal habeas court to vacate the conviction.

**Claims Surrounding Alleged Prior Inconsistent Statement by Dr. Ross**

Defense counsel said in his opening statement that a key issue in the case regarded the wound to the throat of Green.  He said that Petitioner would testify that he cut Green's throat in the bathtub about an hour after the shooting and when Green was dead.  Counsel said that Dr. Karen Ross, who did the autopsy, would testify by video deposition that it was her opinion that Green was still alive at the time his throat was cut. Counsel added that the defense was going to put on DA Investigator Rickey McDonald, who interviewed Dr. Ross and wrote in his report that she told him that she could not determine from the autopsy if Green was alive or dead at the time of the wound to his neck.  Tr. 1198-99.

Defense counsel later attempted to call Investigator McDonald to the stand.  The prosecutor objected that the attempt at impeachment by a prior inconsistent statement was improper under L.C.E. art. 613 because defense counsel did not, when he questioned Dr. Ross at her deposition, direct Dr. Ross to her prior statement and allow her an opportunity to explain it.[2] Defense counsel admitted that he had not done so, but he explained that at the time he deposed Dr. Ross he had not reviewed Investigator McDonald's report in

_____

[2] Article 613 provides: "Except as the interests of justice otherwise require, extrinsic evidence of ... prior inconsistent statements ... is admissible after the proponent has first fairly directed the witness' attention to the statement ... and the witness has been given the opportunity to admit the fact and has failed distinctly to do so."

its entirety so did not realize the potential inconsistency. Counsel said that he agreed to conduct the video deposition of Dr. Ross, who had moved from Shreveport to New Orleans, to save the district attorney's office $6,000 to $10,000, but because of this issue, he would "never do that again, never, never, as long as I practice law in this particular judicial district court ... ." The trial judge ruled that Investigator McDonald's testimony was not admissible because of the non-compliance with Article 613. Defense counsel made a proffer of McDonald's report, which included a note that Ross "could not say Green was alive or dead when his throat was cut but injury did lacerate the jugular." Tr. 1761-66.

Petitioner argues in his issue No. 6 that the trial court violated his constitutional rights when it did not allow the defense to call the investigator to testify. The argument does not give any reason the evidentiary ruling itself violated the Constitution. Rather, it is yet another variation of issue No. 7 and other issues that contend counsel rendered ineffective assistance with regard to this issue. Counsel admitted that he had Investigator McDonald's report prior to the deposition of Dr. Ross but had not read it carefully, and he essentially conceded that his failure to direct Dr. Ross to the alleged inconsistency barred Investigator McDonald from testifying at trial.

Petitioner bears the burden of proving two components, deficient performance and prejudice, to establish ineffective assistance of counsel. Counsel's performance was deficient only if he made errors so serious that, when reviewed under an objective standard of reasonable professional assistance and afforded a presumption of competency, he was not functioning as the "counsel" guaranteed by the Sixth Amendment. Strickland v. Washington,

104 S.Ct. 2052, 2064 (1984). Prejudice exists only if there is a reasonable probability that, but for the error, the result of the trial would have been different. A reasonable probability is one sufficient to undermine confidence in the outcome. Id. 104 S.Ct. at 2068.

The test for habeas purposes is not whether a petitioner made the showing required under Strickland. The test is whether the state court's decision – that the petitioner did not make the Strickland showing – was contrary to, or an unreasonable application of, the standards provided by Strickland's clearly established federal law. Williams v. Taylor, 120 S.Ct. 1495 (2000); Henderson v. Quarterman, 460 F.3d 654, 665 (5th Cir. 2006).

The trial court summarily denied this issue when it was presented in the post-conviction application. Tr. 2542-B. The appellate court rejected the claim because the point at issue, whether the victim was already dead from gunshot wounds when Petitioner cut the victim's throat, "was not a factor in the determination of guilt or innocence." The court noted that Petitioner admitted that he shot the victim and cut his throat, and there was forensic evidence to undermine the self-defense theory. Accordingly, the court reasoned, Petitioner failed to show how Dr. Ross's inconsistent statement being admitted would have given rise to any reasonable probability that the outcome of the trial would be different. Tr. 2722-23.

The state court's application of Strickland was not objectively unreasonable. It was a sound and rational application of the prejudice prong of the Strickland test. As noted above in the sufficiency of the evidence discussion, Petitioner has attempted throughout his habeas petition to depict as critical to the conviction whether the victim was alive or dead when

Petitioner cut his throat. That fact is perhaps of some relevance, but it is by no means decisive, and it is not even important to the verdict. Accordingly, there is no basis for habeas relief with respect to the state court's adjudication of the several <u>Strickland</u> issues related to this issue.

Petitioner makes a somewhat related claim that Petitioner was ineffective because he did not deliver Investigator McDonald's testimony after saying in his opening statement that the evidence would be presented. Counsel obviously believed that he would be able to call McDonald, and McDonald was available to testify, but the unanticipated evidentiary ruling prevented the testimony. There is no indication that any pre-trial ruling should have indicated to counsel that he might not be able to call McDonald, and there is no argument that the prosecution attacked the defense for failing to present McDonald as a witness. Under these circumstances, and especially considering the relative weight of the underlying issue, the state court's adjudication of this <u>Strickland</u> issue was not objectively unreasonable so that the federal court would be warranted in vacating the conviction.

Accordingly;

**IT IS RECOMMENDED** that the petition for writ of habeas corpus be **denied**, and that Petitioner's complaint be **dismissed with prejudice**.

### Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have ten (10) business days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an

extension of time is granted under Fed. R. Civ. P. 6(b). A party may respond to another party's objections within ten (10) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 10 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED in Shreveport, Louisiana, this 4th day of November, 2008.

MARK L. HORNSBY
UNITED STATES MAGISTRATE JUDGE